Case number 13-5292. Securities and Exchange Commission v. Milan Group, Inc. Also known as Milan Trading Group, Inc. Bryony K. Baylor, Appellant. Baylor and Jackson, PLLC, et al. Ms. Dennis for the Appellant. Mr. Starles Lesetsky for the Appellees. Your Honors, may it please the Court. My name is Gina Dennis. I'm here as Counsel through Pro Hoc Vice to represent Defendant Appellant Brene Baylor in this matter. At this point, I'd like to reserve two minutes for rebuttal. And I would like to start off with telling you about this case with a brief recitation of the facts. I'll refer to my client as Brene going forward because that is her name. Brene is an attorney. This is about a woman, a mother of four daughters, a daughter who cares for her own sick mother, and a lawyer who was tricked into believing that she should trust her client named the Milan Group, Inc., which was operated by Frank Lorenzo, also known as Frank Patalico. But Brene only knew him as Frank Lorenzo. Her former firm, Baylor Jackson, was hired by the Milan Group to provide legal services as outside counsel regarding all legal issues, including due diligence, correspondence, employment agreements, and including the project funding matter of issue in this case. I want to be clear here that as to Brene, this matter was certainly a project funding matter and not a securities transaction. She had no idea securities were involved. Her affidavit and the client engagement letter support that position. Brene was not and is not in the business of selling securities, and in no time did she sell securities during this transaction. Brene had no knowledge of the impropriety of the funding, Frank introduced Brene to Vanille Johnson, who at the time held himself out as an attorney in good standing in the state of Nevada, but seasoned in the area of international law. For purposes of going forward, I will refer to Mr. Johnson as Val. Val also made it clear that he was the managing member and counsel for the participant in the transaction. Your Honors, I want to emphasize what I just said. Frank and Val knew each other, and Frank introduced Brene to Val. Further, Frank and Val were on opposite sides of the transaction. Brene made it very clear to Val and to other attorneys on the other side of the transaction before the commencement of the transaction that she had never, ever handled this type of transaction before. Val said that he would offer Brene guidance, but he said he completed the exact same transaction successfully before. There was aiding and abetting, yes there was, but the aiding and abetting was on the part of Frank and Val, not Brene. Val held himself out as an attorney and said he had completed this type of transaction before. I want to reiterate that Brene met Val before the transaction commenced. Frank and Val were the puppet masters here, coming from both sides of the transaction, unbeknownst to Brene, surrounding her in a sandwich of deception. Frank on one side and Val on the other, each lying to Brene from the onset about the nature of the transaction, their professional status, and ultimately who they were. My client's prayer for relief is that the Honorable Court reverse the judgment of the District Court and remand this case to trial to be heard before a jury. At this time, Your Honors, I'd like to transition into the legal arguments. There are three main issues I will discuss and I'll provide a brief public policy statement in closing. First, the plaintiff's motion for summary judgment was improperly granted by the trial court. There exist genuine issues of material fact and dispute that must be decided by a jury. In addition, we will address that the SEC should not have been granted summary judgment as a matter of law because it failed to satisfy the Prima Foster case for an SEC violation. The SEC failed to show material representation and SciENter. The next issue that I will discuss is that the District Court erred in determining that Brene was a seller of securities. The final issue is that the disgorging and penalties award by the District Court exceed the amount of money received by Brene and therefore were excessive and inappropriate. I take you back to the first line of the argument, which is that the first plaintiff's motion for summary judgment was improperly granted by the trial court. There exist genuine issues of material fact and dispute that must be decided by the jury. I want to get straight to the bottom line right away. Brene exercised all the necessary due diligence any reasonable attorney would. Sure, she has an impressive resume and a great academic record, but there was an error. Her error was an error in trust. She trusted people. Your Honors, I am appealing to you on a very human level right now. Everyone here at some point in their life has been manipulated by someone. Ma'am, could I interrupt you? Yes. Do you have the supplemental appendix of the government in front of you? Do I have it? I'm sorry, I can't hear you. Do you have the supplemental appendix? Because I want to ask you some questions about it. May I ask for his indulgence? Of course. So this is on the question of whether she was reckless in what she did. Our cases say that recklessness, or at least extreme recklessness, is sufficient. So I want to go through some of the documentation that was introduced into the court below and ask you how it's consistent with your representation that she did everything that she needed to do. So if you look on Essay 151, that is the transcript of a tape recording of her conversation with an undercover FBI, two undercover FBI agents who posed as investors. Right. They say at the top of 151, okay, we're going to invest a million dollars, but in 30 days we're supposed to receive 250% of our investment back. So that's very exciting for us, obviously. And then your client is transcribed as saying, Right, absolutely. He actually just completed a transaction very similar to that, and a wire is supposed to be sent out today to my escrow for the participants in a trade very similar. As we go further along, repeatedly throughout the day for 30 days, and at the end a tremendous amount of money is made, a very high upside is in place for the actual trader. This, of course, is international, so it's not subject to federal laws or governments. So that's why they're able to do the 250% return on your funds. That is what I understand. Now, that doesn't sound like she's simply trusting somebody else. That sounds like she's saying that she knows that a similar trade in which somebody made 250% return in just 30 days had occurred. Would it be unreasonable for a judge to conclude then that no reasonable jury could conclude otherwise, that this was reckless? These facts are certainly in dispute. Which facts are in dispute?  Of course. Thank you. The facts that are in dispute here from page 151, there was an email sent to Renee at the beginning of that day notifying her that a transaction had completed. That's fact one. In fact two, she submitted emails and spoke with the banker for the transaction. But what I want to make clear here is that, and this comes from the recitation of the facts, Renee was relying on Val, someone who reported themselves and held themselves out to be a sophisticated attorney who had done this exact same type of transaction before. All of the knowledge that she explains that she has came from the guidance of Val, the person that she relied on. What she says on the next page, the FBI agent says, well, I haven't seen any documentation yet, but you've been involved, I guess, for some time. She says, yes, I have. As a matter of fact, in fact, like I said, this is not the first one this month. The funds are actually in place now to be paid out. So that doesn't sound like she's listening to somebody else. It sounds like she's making a representation that she knows about it. According to Renee's affidavit, it is the banker that did inform her of this information. So you don't think it's reckless? Even if a banker told you, you don't think it's reckless to believe that somebody could make 250% in 30 days with no risk? It sounds like that's for a jury to decide. Why is that for a jury to decide? I just want to know, isn't the standard whether any reasonable person could believe that to be true, not whether she knew it herself? This is a recklessness scienter that we're talking about. And I wish that the SEC understood that same standard because they've clearly held her to a higher one here. Well, that's not what the judge did. Don't you think it's... Rather than go through all of these, the bottom line of all of these representations on her part is that clients will receive extraordinary large amounts of money, percentages, returns, with virtually no risk at all. Her affidavit completely contradicts all of these statements, Your Honor. I'm not sure which statement. With respect to her position and the guidance that she received from Val. All of the knowledge that she presents in this transaction don't come from her experience, they come from the experience of third parties in her life. She is asserting in this transcript what she saw and what funds she was aware of and what payouts she knew about. She's a lawyer. And if a lawyer asserts that, the person who's talking to the lawyer assumes that it's an honest assertion. She is asserting it. These transcripts don't say, Val told me that and I think this is right, or you'll have to confirm it. She is saying, I know this. When she is... May I ask for the court's indulgence? Your Honors, my client has informed me that the context, this has to do with context, and she had a direct conversation with the commercial banker at the time, and this is also listed in her affidavit. And the other thing that's very important is she did have to rely on her client as well, and she trusted her client. That's stated in her affidavit and the recitation of the VAX as well. She trusted and believed in her client as any reasonable attorney would. She did take due diligence steps. She had no idea of the impropriety of the transaction. Ms. Dennis, maybe it would be more straightforward to focus on the documents. So Ms. Baylor was an attorney doing, as you say, due diligence. She was not a customer who was relying on the words of bankers. She was an attorney who had an affirmative obligation to do due diligence and assure the soundness of these transactions. Is that right? That is correct. So one of the things that she did in her role as an attorney was draw up escrow agreements and accept monies into escrow. And those escrow agreements promised that she would not release investor funds to any party, including herself and the Millon Group, without at a minimum express authorization from the investor. And that's throughout the record, supplemental appendix at 212, 214, 218. But in each instance, she received investor funds and would turn around and immediately disperse them from her accounts. She'd disperse them to Millon. She'd disperse them to Baylor and Jackson. She'd disperse them to relief defendants. And she did that right away. With respect to, for example, Investor C, there were bank statements showing transfers. The escrow agreement clearly said those funds are not to be touched for two months, for 60 days. But she turns around right away and disperses some of those funds. And that just seems to me to be something that's within her control. She drafted. She made representations. And this is a critical part of the basis for representing that these were no-risk investments was that the money wasn't going to be touched until the vehicle in which they were being invested had actually already borne fruit. Okay. There are three points I want to raise. Thank you. First is that the fact that we're talking about this word invest, investor investment, those are issues still in dispute. We do not even know that this was actually a securities transaction. Did you brief that? I thought the only point in the brief about whether she was a seller of securities was whether because she was a lawyer she could be a seller of securities. There wasn't an argument that these were not, in fact, securities. Early on in her affidavit, she makes it clear that in her client agreements and from the very beginning of the transaction, she never, ever believed that this was a securities transaction. But that's not briefed to us before this court, any argument that these are not securities. In fact, I'm not sure there's any legal basis for that argument. There is in the sense that it's a fact that she believed that this was a loan and not a security, and that's listed in her affidavit. And it's also listed in Exhibit 15 in the McLean Exhibit of the SEC. The SEC deposed Attorney Bach, a sophisticated attorney, and the SEC relied on the statements in that deposition and that attorney's interpretation of the transaction as to be a loan transaction and not a securities transaction. So is your argument, Ms. Dennis, that there's a specific intent requirement that in order for Ms. Baylor to have intended the violations of the Securities Act, she had to be specifically aware that she was dealing in securities and that there's no proof of that intent? What I'm saying is that all of these issues are in dispute and that it's for a jury to decide whether or not... Well, some issues are in dispute and some issues aren't, and it's more helpful to us to have a very specific answer. So with respect, are you making an argument that the law requires that she be intending to sell something that she knows is a security? No. No, Your Honor. But I do want to get back to your statement that you did say that there are some issues that are in dispute here and there are some issues that are not. And there are numerous facts that are in dispute, whether she was deceived, whether there was any knowledge, whether this is a security, whether she should be someone that should have held herself out as having knowledge. I refer you back to McLean Exhibit 15. The SEC relied on the statements of that deposed party. Attorney Bach is a sophisticated attorney. In that situation, Attorney Bach explains that he relied on a sophisticated businessman, Matt Farber, for his understanding and interpretation of the transaction. The SEC's found it okay for Attorney Bach, a sophisticated attorney, to believe in the legitimacy of the transaction, but the SEC takes a completely different position with Bernay using the same exact evidence. Could I ask you about Supplemental Appendix 159? This is the e-mail from your client to a customer. I am writing to confirm the validity of the transaction that your client is involved in. First, I have observed this company successfully complete transactions of this nature, whereby participants receive their funds as agreed. Second, I have been personally involved in this transaction and can validate it. Now, was that untrue? Is your position that she was not personally involved and that she had not observed the company successfully complete the transactions, or is your position that it is true? The court's indulgence, please. Thank you, Your Honor. My client, Ms. DeSantis, I want to caution you that you not make representations  because my assumption is that there may be criminal jeopardy in this case and that, therefore, you don't want to make representations in open court about what your client's telling you, make a legal argument. The only question we're asking you is what is your position. That's the way I put the question. This is true. It's true. So then she is saying that she observed the company successfully complete these transactions and that she was personally involved in the transaction. And yet, in her deposition, she says that, on page 164, we've never received or been aware of receiving any profits. That would be profits from any of the deals in which you participated as counsel for the Milan Group. That's correct. Do you mean that there were never any profits to be distributed to the investors? I know we never received any profits. At 165, well, by this time, I hadn't. You had over a year of dealings on these bank issues where no investment had actually produced any money for investors. Her answer at the time, I wasn't sure. I thought at the time I wasn't sure. Question, well, you hadn't seen any evidence of any return to the investors, right? Answer, no, not directly, no. That seems inconsistent with what she's telling the investors, which is that she's been personally involved in these and she's seen the participants receive the funds as agreed. If it appears that there's an inconsistency, then this is certainly something that a jury would need to hear. It's not something the jury needs to hear if it's a confession by the – it's an admission by your client. There's no need for a jury – no reasonable jury could reach a different conclusion when you have your own client making representations to investors that she's seen the money go back to them and then her admitting in a deposition that she has not seen the money go back to them. I think that we have a different view of this deposition. And when taken from our view and within context, it's – this is not an admission. So whether this is an admission or not is something that is in dispute. Not an admission as a legal matter, you mean, or as a factual matter? As a factual matter and as a legal matter. Okay. Further questions from the panel? Further questions? Anyone? No. Do you have anything more you want to say? Yes. We're sort of out of time, so if you could wrap it up, that would be helpful. Okay. I want to draw you to Exhibit 15, pages 15 to 28. 20 to 28, Exhibit 15, the McLean exhibit. In this – this is an example of the SEC taking two sides of the coin when we asked the question of whether or not Brene had knowledge of any impropriety. And one of the coins said, Sophisticated Attorney Bach was advised by third-party sophisticated businessman Matt Ferber in terms of a project funding transaction in order to establish a commercial lending arm. If you look at Exhibit 15, pages 20 to 28, Bach is being advised by a sophisticated third-party and Bach is deemed by the SEC to have no knowledge of the improprieties of the transaction. But if you look at the other side of the coin, which is the other side of the position the SEC is taking, Brene was also advised by a sophisticated third-party, Attorney Bao, about the type of the transaction. Yet somehow, even though she was advised by this third-party of the validity and success of the transaction, somehow the SEC deemed her to be a villain and to have knowledge of the impropriety of the transaction. To emphasize, both Attorney Bach and Attorney Brene relied on sophisticated third-parties for information. Yet the SEC deemed Attorney Bach as an innocent party with no knowledge of the impropriety, a victim. But the SEC deemed Brene a villain with knowledge. How is that possible? That means the SEC is using the same exact evidence to assert two completely different positions, which demonstrates a clear conflict here, a dispute of material facts. Okay, thank you. We'll hear from the SEC. May it please the Court, Daniel Staroselsky for the Securities and Exchange Commission. The District Court properly entered summary judgment for the Commission because the undisputed facts establish that Ms. Baylor, at the very least recklessly, engaged in a wide range of deceptive conduct. I think the main points that I wanted to make have already been brought out by the Court. I think what the case really boils down to is that Ms. Baylor repeatedly told investors in no uncertain terms that she had seen investments successfully return funds to investors. That is both in the FBI call that Your Honor referenced. It's also at Supplemental Appendix 159. I think there's even more of a direct contrast between the email at Supplemental Appendix 159 and Ms. Baylor's deposition that points the Court to Supplemental Appendix 327. I'm sorry, Supplemental Appendix 335, and that's page 327 of the transcript. And this is the deposition where we're asking her about this very email. And the question is, but you had never personally seen any transactions complete successfully since you represented Mr. Lorenzo. Answer, not at that point. Question, right, and she says, but I was personally involved in the transaction. So that's just one of the many examples. Of course, there are others where she admitted that she had not, in fact, seen any funds be returned. Of course, they could not be returned, given the nature of the scheme. The only other point that I wanted to make, and I think it's been brought out by Judge Pillard's questioning as well as Judge Edwards', is the fact that she's an attorney really makes the conduct much, much worse, not better. And that's because investors, the general public, understand that an attorney is an officer of the court, is understood to be under additional duties to speak honestly. Is that reflected in the securities laws? Is a misrepresentation by a lawyer worse than a misrepresentation by a layperson dealing in securities? No, I don't think so. I think it's more of a matter to the fact that she's an attorney goes more to her remedies. Right now, we're talking about the merits question. Does it matter whether she's a lawyer or not? I'm not saying it doesn't. I just don't know the answer to that question. I know it looks worse to be an attorney, but that's really not the question. I think on the merits, it makes the deception more powerful. As a legal question, the Supreme Court held in the Central Bank case, any person, including an attorney, may be held primarily liable so long as all the elements of liability are satisfied as they are here. To me, one of the issues where it would make a difference, a legal and factual difference, is that she has said these are international transactions and therefore not subject to U.S. regulation, which is not, as far as I'm aware, an accurate representation if the investment opportunity is being offered within the U.S. market. But that kind of representation is one that I think the average investor would take differently when made by a lawyer than made by a layperson. Right. I think that's fair. I also think Judge Pillard's point about the escrow fund seems like an important point, that the money went—is it accurate that the bank records reflect that the money went into her escrow fund, that is, her law firm's escrow fund? It went into her law firm's IOLTA account. Yes. And then there's some disputes as to what she told investors as to whether funds would be released at all. There's no dispute whatsoever that over two-thirds of investor funds were funneled back to her and Mr. Pavliko without disclosure to investors. And didn't the agreements, the escrow agreements themselves, say otherwise, that they would not be moved? Right. I mean, that's how I read them. But I recognize that we're at summary judgment, and she says that she had conversations with investors who authorized the movement or the release of funds, and so that's why I'm focusing more on the disclosure of the percentage of the fees. I see. Okay. Further questions? I have a question about the fines. My understanding of the law, and I don't think we have a case in this circuit, but there's a case in the Second Circuit that fines need to be imposed individually, and in this case the district court imposed the fine jointly and severally, and it seems clear to me both under the statute and under the SEC versus Pentagon Capital Management case in the Second Circuit, that's 725F3279, that the statutory language here requires that the penalty be awarded individually. So I just want you to address whether we can sustain a fine that was jointly and severally levied against Ms. Baylor and Jackson Baylor. I think certainly because Ms. Baylor never made this argument to the district court, that's one ground for sustaining it. In fact, this court has sustained joint and several civil penalties, I grant you nothing. Civil penalties or disgorgement? No, no, civil penalties. It's in, I believe the case is SEC against Levine. It's the district court awarded joint and several civil penalties, and then this court affirmed there wasn't, I'm not saying that there was a big analysis of the issue as there was in Pentagon Capital. Was there any analysis? I don't recall there being any analysis, but there was the judgment. It was affirmed. And, you know, I recognize it can be an issue. I think it is appropriate in this case given the nature of the law firm here. We're not talking about, you know, a law firm with thousands of people and therefore it makes sense to distinguish on the one hand the attorney, one attorney, and on the other hand the whole law firm. Here she essentially is the law firm. Well, that was one of my concerns. I could see a district court imposing fines against her and or the firm if the court had made a finding that the firm really didn't have any bona fide, separate legal identity that really she was using it as her alter ego and that there was, you know, no reason to view them separately, then it really wouldn't be imposing joint and several liability. But given that the district court did not so find, and it seems like it's a complicated situation because this is a firm that doesn't exist, and so really what happens is that whatever fines are being levied against the firm, and maybe you can tell me something about successor liability that will clear this up for me, but any fines that are being levied against the firm are really being levied against her individually. And I'm just not sure that I can square that with the terms of the statute. I mean, I appreciate that. And the other thing I would say is in many ways this actually benefits her because if the court were to remand, the district court would be well within its discretion in imposing civil penalties against both her and the firm, which in practice, and I understand that there's not explicit findings as to, you know, piercing the veil between her and the firm, but in practice we know that they're very close, would leave her, I think, worse off. Well, don't the penalties have to be limited to what she actually received? And it's kind of a, you know, she has to disgorge, but then she also gets a penalty up to the amount that she actually received. So there would have to be some showing by the government of what portion she received because some of it was received by her law partner, some of it might have been paid out to others. So there would have to be some additional fact-finding, no? No, I don't think so. I mean, and again, this has not been preserved for this court's review, but the penalty here, the district court has broad discretion in measuring it, and I think the way, you know, one way it could measure it is by deceptive acts. Here we have a lot of them, which, you know, multiplied by, I think, the penalty for third tier, the third tier civil penalty is about something like $150,000 for each act or violation. If the district court were to go that way, that would potentially vastly exceed the roughly $750,000 that we have here. You know, I'm sorry? No, I'm about to ask you a question, but if you want to answer this more. Well, my question is, do you have any idea how PLLCs work? I mean, a fine of $700,000 against the law firm could end up being the obligation of each individual partner, and in a traditional law firm, it is the obligation of each individual partner. I don't know whether, I don't know, and apparently it's never been presented, whether that makes a difference here or not, and also whether, even if it did, the veil is pierceable. You don't know? Your Honor, I'm just not sure. We didn't ask for joint and civil liability. The court awarded it. We think it's within the district court's discretion to fashion relief here, and the record supports it. Wait, what did you just say? Your voice tailed off. What did you say? We think that the record supports what the district court did. Well, that's the point that Judge Pillard has been raising. How is it supported if the statute says individual? You mean, your starting point was it wasn't preserved. That's different from saying the record supports it. Right, right. I mean, it looks like the record does not support it. That's why I think you started out by saying it wasn't preserved. No, no. What I'm saying is the actual judgment, the dollar amount, is supported. And the way – I'm sorry. Is Your Honor asking about the joint and civil aspect of it or – oh, I see. Okay. Well, right. Then we did not make an argument as to joint and civil liability for piercing the veil for civil penalties. And it seems like that's a pretty obvious error, and it's an error that's likely to be repeated, no? I mean, we wouldn't want to make precedent that it's okay. We want to clear that up. Well, you know, I think that if the court felt that this was an error that needed to be cleared up, I think it should wait for the opportunity where it's preserved. Fine. It's only judgment. We review it then over. Well, you were correct. The objection was preserved. If it's forfeited by not having been raised, we're not creating any precedent one way or the other. We're just not reviewing that point anymore. Right. And as I said, I mean, this is not – I understand the Pentagon Capital case, but in this district there is the SEC against Levine case. You didn't say anything there. Right. So that's not helpful. It's just the result, but we don't normally just look at a result and say, well, here's what that means. It didn't answer the questions that we're now wondering about. I appreciate it. Is there any concern that Don Jackson would be responsible for any of the fine liability that was levied against Baylor and Jackson? I've not seen – She was a party in the district court, did not appeal. Baylor and Jackson was a joint firm. I just – you know, on the point that Judge Garland was making about – Well, we settled with Ms. Jackson. Right. I understand. So I don't – You think because she has a total release of liability, there's nothing going against her. So any liability that would be hers is, again, is going to go against Ms. Baylor. For example, if half the money that went into Baylor and Jackson was spent by Don Jackson for her personal trips and purchases, that's something that Ms. Baylor would be left responsible for in your position because that argument was forfeit. Is that right? Again, as to penalties or discords? They're penalties, which are based on the amount of money, which may be based – and I understood here, given the figures in this case, were based on the second statutory option, which is not on the capped specific statutory amounts but on the gross amount of pecuniary gain to such defendant as a result of the violation. I mean, clearly the figure that the district court used was a figure that was what it thought was equal to the disgorgement figure, and it just said, we're also going to impose that over and again as a fine, right? So that's money that went into the firm. Into the firm, right. Yeah. Right. And so my point is if that money went into the firm and if the firm was a partnership and if one of the partners took half of it and the other partner took half of it, but the one partner has gotten out of the case with a much smaller settlement involving her disgorgement, then there's a kind of a double fine going on against the remaining defendant, which is that any money that was in fact a pecuniary gain to Ms. Jackson is something that is now being imposed as a measurement of a fine on Ms. Baylor. See, I just don't see it, Your Honor, as a double fine. I think the joint and several aspect of it actually reduces it because, again, if the court said that you can't have joint and several civil penalties, then I think the district court would be able to hold both Ms. Baylor and the law firm individually liable for those amounts. The gross amount of pecuniary gain to such defendant would have to do some kind of apportionment of what the pecuniary gain was to Ms. Baylor. Well, right, under that provision. Right. And you're saying, well, they could have done it. The district court could have done it under the capped specified sort of liquidated amount, but it didn't. It clearly didn't. Right. So maybe it did benefit her, but maybe not. Right? It's a lot of hypotheses that you're asking us to indulge. When you say about the benefit, I took it, my understanding of what you were saying was if we were to remand, the court could then do this, right, so that the consequence of a remand might be worse for the plaintiff, for the appellant. Am I understanding your argument correctly? Yes. Unless it's a confined remand. This court has discretion as well. Right. Further questions? No. Okay, thank you. How much time is left for the appellant? You're actually ten minutes over. We'll give you one minute if you want to respond. Your Honors, it is never deception when you honestly believe that everything you are doing is honest. The ULTA funds were never released without written permission by the participants. The SEC does have documentation of each written authorization to release. Brene personally received $156,000 for the entire representation of Milan. Here the discouragement is being used in a punitive manner because Brene was never enriched unjustly and the amount of discouragement is excessive. It's inappropriate and premature to even discuss discouragement because there are still issues of material fact and dispute. Dawn Jackson was made the managing partner of Baylor & Jackson. After the SEC filing, she elected not to appeal and Brene had no right to appeal on behalf of the firm. The SEC has taken tremendous facts out of context. The facts in this case are critical and still in dispute and the case must be remanded. Okay, thank you very much. We'll take the matter under submission.
judges: Garland, Pillard, Edwards